UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SENECA NATION OF INDIANS,

                              Plaintiff,

                                                          **DECISION AND ORDER**
                                                          **(Preliminary Injunction Motion)**
            v.                                            10-CV-687A

DAVID PATERSON, Governor of the State of New
York, JAMIE WOODWARD, Acting Commissioner,
NYS Department of Taxation and Finance, WILLIAM
COMISKEY, Deputy Commissioner, Office of Tax Enforcement,
New York State Department of Taxation and Finance,
JOHN MELVILLE, Acting Superintendent, New York State Police,
each in his or her official capacity,

                              Defendants,
_____

CAYUGA INDIAN NATION OF NEW YORK,

                              Plaintiff-Intervenor.

_____


## INTRODUCTION

        The Seneca Nation of Indians ("SNI" or "Seneca Nation") commenced this action

on August 17, 2010, seeking to enjoin implementation of certain amendments to the

New York State tax law relating to the taxation of cigarettes sold by reservation retailers.

Along with the complaint, SNI filed a motion for a temporary restraining order and a

preliminary injunction.  On August 31, 2010, this Court issued a temporary restraining

order and enjoined implementation of the tax law amendments pending a hearing on the

preliminary injunction motion.  In the meantime, the Cayuga Indian Nation ("CIN" or

"Cayuga Nation") moved for, and was granted, permission to intervene and joined in the preliminary injunction motion.

A preliminary injunction hearing was held on September 14 and 15, 2010. On September 23rd, the Court heard supplemental argument on the motion for a preliminary injunction. Upon all of the testimony and evidence presented in support of and in opposition to the motion, and after hearing argument from counsel, the Court denies the motion for a preliminary injunction and finds that plaintiffs have failed to demonstrate a likelihood of success on their claim that the tax law amendments unconstitutionally burden their right of tribal sovereignty.

## BACKGROUND

I.    **Tobacco Economies of Seneca and Cayuga Nations**

   A.    *Seneca Nation*

The Seneca Nation of Indians Nation is a federally-recognized Indian nation comprised of five territories throughout Western New York: the Allegheny Territory, the Cattaraugus Territory, the Oil Spring Territory, the Niagara Falls Territory and the Buffalo Creek Territory. Approximately 4,000 of the Nation's members live on either the Cattaraugus or Allegheny Territories. Another 3,000 members live off Nation property in New York State. No members live on the Oil Spring, Niagara Falls or Buffalo Creek Territories, although there is at least one tobacco retail store on each of those three territories.

SNI members characterize its tobacco economy as a well-established free market tobacco economy. In 2006, SNI enacted its own Import-Export Law (IEL) to combat cigarette trafficking and to create its own tax stamp system. Under the IEL, the Seneca Nation assesses a $0.75 per carton (7.5 cents per pack) tax on all imported[1] cigarettes sold on Nation property. The SNI stamp is affixed by one of 15 SNI-licensed cigarette stamping agents. All cigarettes imported onto SNI territories must be stamped by one of the 15 SNI stamping agents within 48 hours of arriving on Nation territory, before being sent to Nation retailers for resale to the public. There are approximately 172 SNI-licensed tobacco retailers who collectively employ about 3,000 SNI member and nonmember employees.

Revenue generated from the SNI tobacco tax is used by the Nation to support government and social services. Since the enactment of the IEL, SNI has collected approximately $45.7 million in revenue and fines.[2]

B.    *Cayuga Indian Nation*

The Cayuga Indian Nation is also a federally-recognized Indian nation. The Cayuga Nation is comprised of a 64,000-acre tract located in Seneca and Cayuga Counties. The CIN tobacco economy operates differently from that of the Seneca

---

[1] Cigarettes manufactured on SNI Territory are not subject to the $0.75 stamp tax.

[2] The Seneca Nation asserts that it has engaged in substantial efforts to combat cigarette trafficking and has worked cooperatively with federal agencies such as the Bureau of Alcohol, Tobacco and Firearms. The Court accepts that testimony as true for the purposes of this Order.

Nation.  The CIN operates two tobacco retail convenience stores–one in Seneca County and one in Cayuga County.  Both stores are Nation-owned and sell to CIN members and nonmembers.  The Cayuga Nation does not have its own cigarette stamp or cigarette import-export law.

II.    **State's Efforts to Tax Nation**

The background and history of New York State's cigarette tax collection efforts has received widespread media attention.  The issue has been notably contentious and there is strong public support for both sides.  A comprehensive recitation of New York's efforts to collect cigarette taxes from reservation retailers is set forth in *Cayuga Indian Nation v. Gould*, 14 N.Y. 3d 614 (2010).  Summarized briefly,

> Since 1939, New York has imposed sales taxes on cigarettes sold in this state under Tax Law § 471, which generally requires the use of tax stamps that are purchased by cigarette wholesalers and then affixed to packages of cigarettes. Under the statute, the "agent"—typically the wholesaler—is "liable for the collection and payment of the tax on cigarettes . . . and shall pay the tax to the tax commission by purchasing" tax stamps  Having prepaid the sales taxes, wholesalers pass the tax obligation on to distributors who, in turn, collect the taxes from retailers, until they are finally paid by consumers. Thus, the "ultimate incidence of and liability for the tax [falls] upon the consumer." [New York] Tax Law § 1814 declares that it is a misdemeanor to willfully evade the cigarette tax.

> Tax Law § 471 (1) recognizes that there are certain instances when the State must forgo cigarette tax collection because it is "without power to impose such tax." At the time of its enactment in 1939, one of those situations included the sale of cigarettes occurring on Indian reservations since states were not authorized to tax goods sold by an Indian Nation on its reservation until 1976. That year,  the United States Supreme Court decided *Moe v Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 US 463, 483 (1976), which held that states may impose sales taxes on goods sold by members of an Indian nation on reservation

land to purchasers who are not members of the nation, particularly when it is the non-Indian purchaser who bears the ultimate tax burden under state law.

In the aftermath of *Moe*, in 1988 the New York Department of Taxation and Finance promulgated regulations aimed at implementing a scheme to calculate and collect the sales taxes due from sales to non-Indians on reservation properties in New York. The regulations adopted a "probable demand" mechanism that limited the quantity of unstamped—i.e., "untaxed"—cigarettes that wholesalers or distributors could sell to tribes and tribal retailers. The Department would either project the "probable demand" for cigarettes attributable to members of a particular Indian tribe or nation, thereby restricting the quantity of unstamped cigarettes that could be sold to that tribe or nation to that estimated number, or enter into agreements with tribal leaders to determine probable demand. Tax exemption coupons would be issued to Indian retailers representing their monthly allotment under the probable demand formulation and the retailers could then exchange those coupons with wholesalers for unstamped cigarettes. Retailers were to sell unstamped cigarettes only to "qualified Indians," who would be provided with individual exemption certificates to present to retailers when purchasing cigarettes.

The 1988 regulations were never implemented by the Department, however, because the proposed tax collection scheme was immediately challenged by cigarette wholesalers who claimed the regulations were preempted by federal statutes governing trade with Indians. The litigation proceeded to the United States Supreme Court, which ultimately rejected the wholesalers' contention in 1994. *See Department of Taxation & Finance of N. Y. v. Milhelm Attea & Bros. ("Milheim"), 512 US 61 (1994)*. The Supreme Court reaffirmed the principle articulated in *Moe* and further declared that "States may impose on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes from non-Indians." *Id.* at 73. Thus, the Court recognized the authority of states to collect sales taxes relating to cigarettes sold to non-Indians on reservation property or other Indian lands provided the regulatory scheme is not "unduly burdensome" *Id.* at 76.

*Cayuga Indian Nation,* 14 N.Y.3d at 622-25 (internal citations and footnotes omitted).

Although *Milhelm Attea* "seemingly paved the way for implementation" of § 471 of the

New York Tax Law, *id.* at 625, the State voluntarily delayed enforcement pending

consideration of other issues arising from the decision and to allow for negotiations with the tribes in an attempt to enter into compacts or agreements pertaining to the collection of sales taxes. *Id.* at 625. Other litigation further stalled efforts to implement the cigarette tax scheme.

In 2003, the New York State Legislature adopted New York Tax Law § 471-e, which directed the Department of Taxation and Finance (DTF) to collect cigarette taxes on reservation sales to non-Indians. *Id.* at 627. DTF drafted regulations, but never formally adopted them. Section 471-e had an effective date of March 1, 2006. When that date passed without DTF adopting formal regulations for collection of on-reservation cigarette taxes for sales to non-Indians, a state wholesaler and tribal retailer brought a declaratory judgment action in state court seeking to declare § 471-e unenforceable. In May 2008, the New York Appellate Division, Fourth Department, agreed holding that, absent a procedure "that would permit the State to collect taxes on reservation sales to non-Indians . . . while simultaneously exempting from such tax reservation sales to qualified Indian purchasers," § 471-e was not "in effect." *See Day Wholesale, Inc. v. State of New York*, 51 A.D.3d 383, 387 (4th Dep't 2008). The Fourth Department then issued an injunction that remained in place until it was lifted in September 2010.

In the interim, the New York Court of Appeals decided *Cayuga Indian Nation v. Gould*, 14 N.Y.3d 614 (2010), which granted declaratory judgment in favor of the Cayuga Nation and declared that the Nation was under no obligation to collect and transmit cigarette taxes for on-reservation cigarette sales to nonmembers absent a  regulatory

scheme governing the calculation and collection of cigarette taxes to nonmembers.

III.    **June 2010 Tax Law Amendments and Emergency Rule**

The Court of Appeals' decision in *Cayuga Indian Nation* was issued on May 11, 2010.  Several weeks later, on June 21, 2010, the New York Legislature amended N.Y. Tax Law § 471 and § 471-e.  The amendments increase the cigarette tax from $2.75 to $4.35 per pack.  N.Y. Tax Law § 471(1).  The following day, on June 22, 2010, DTF adopted an "emergency rule" to implement the amendments. *See* 20 N.Y.C.R.R. § 74.6. Together, the 2010 amendments and the emergency rule (collectively referred to herein as the "tax law amendments" or "amendments") seek to set forth a system for collecting taxes on sales made by Indian cigarette retailers to nonmembers while at the same time attempting to balance the right of Indian members to obtain cigarettes tax free for use and enjoyment on reservation territory.  It is the validity of those tax law amendments that is at issue in this motion.

The amendments provide that the cigarette tax set forth in § 471 does not apply to cigarette sales "to qualified Indians for their own use and consumption on their nations' qualified reservations," but that a tax is imposed on all cigarettes sold "on an Indian reservation to non-members of the Indian nation or tribe" and that "evidence of such tax shall be by means of an affixed [New York State] cigarette tax stamp." *See* N.Y. Tax Law § 471(1).  The amendments further provide that "the ultimate incidence of and liability for the tax shall be upon the consumer" and require New York state-licensed stamping agents and wholesale dealers to prepay the tax by purchasing tax stamps from

the Commissioner of DTF.  Tax stamps are then affixed to each pack of cigarettes and the tax is required to be collected and added as part of the sales price for the cigarettes. *Id.* at § 471(2), (3).  The statute unequivocally provides: "All cigarettes sold by agents and wholesalers to Indian nations or tribes or reservation cigarette sellers located on an Indian reservation must bear a [New York State] tax stamp," *id.* at § 471(2), including cigarettes intended to be sold to tribal members for use and consumption on reservation territory.

The amendments contemplate two alternative statutory mechanisms by which Indian nations and their members may obtain tax-exempt (albeit New York State tax stamped) cigarettes: (1) an "Indian tax exemption coupon system" and (2) a "prior approval" system.[3]  *See* N.Y. Tax Law § 471(1).


### 1.    Coupon System

An Indian nation must affirmatively elect to participate in the "Indian tax exemption coupon system" (hereinafter "coupon system").  Under the coupon system, the DTF distributes a quantity of Indian tax exemption coupons to a participating Indian nation based upon DTF's calculation of the "probable demand" for tax-exempt cigarettes by members of that nation for their own personal use and consumption.  N.Y. Tax Law § 471-e(2).[4]  Those coupons can then be used by the Nation to obtain the "probable

---

[3]  A third alternative is also available whereby an Indian nation and the State enter into an agreement as to the distribution of tax-exempt cigarettes.  Neither plaintiff has elected to pursue this option.

[4]  The Emergency Rule calculates the probable demand for tax-exempt cigarettes by members of each Indian nation for their own personal use and consumption under both the

demand" quantity of cigarettes from a state-licensed wholesaler without paying the cost of the New York tax stamp to the wholesaler. Alternatively, the Nation can distribute the coupons to reservation retailers who then redeem them for tax-free cigarettes directly from state-licensed wholesalers. The amendments do not provide for allocation of the coupons among reservation cigarette sellers or tribal members. Instead, the amendments contemplate that the tribe or Indian nation will allocate the coupons among reservation cigarette sellers or, alternatively, redeem the coupons itself from a state-licensed wholesaler. In other words, New York State determines the number of coupons that each Indian tribe should receive and distributes those coupons to the tribe itself, leaving the tribe with the obligation to determine how those coupons should be redeemed, allocated and distributed. DTF issued a taxpayer guidance memorandum, TSB-M-10(6)M, explaining the coupon system as follows:

> When the coupon system is in effect, an Indian nation or tribe may purchase stamped packs of cigarettes for its own official use or consumption from a wholesale dealer licensed under Tax Law Article 20 without paying the cigarette excise and prepaid sales taxes to the extent that the Indian nation or tribe provides the wholesale dealer with Indian tax exemption coupons.
>
> A reservation cigarette seller may purchase cigarettes for resale from a wholesale dealer without paying the cigarette excise and prepaid sales taxes, provided that . . . [*inter alia*] the reservation cigarette seller provides the wholesale dealer with Indian tax exemption coupons entitling the reservation cigarette seller to purchase the quantities of cigarettes allowed for on each Indian tax exemption coupon. . . .

Indian tax exemption coupon and prior approval systems by reference to United States per capita average cigarette consumption and federal census data for each nation's population in New York State. *Id.* at § 74.6(e). Based upon this calculation, the Emergency Rule sets the quarterly cigarette quota for the Seneca Nation of Indians at 168,600 packs. *Id.* The quota for the Cayuga Nation is 20,100 packs per quarter.

Thus, either the Nation itself or its reservation cigarette sellers can "redeem" the coupons by providing them to state-licensed stamping agents and wholesale dealers and thereby obtain tax-exempt (albeit stamped) cigarettes for purposes of resale to Nation members. N.Y. Tax Law § 471-e(3). The state-licensed wholesalers then submit these coupons to DTF in conjunction with a refund request for taxes prepaid on stamped cigarettes not in fact subject to the State tax. N.Y. Tax Law § 471-e(4).

### 2. Prior Approval System

The second mechanism is referred to in § 471(5) as the "prior approval system." The prior approval system is the "default" system in that it controls by default if an Indian nation fails to elect to participate in the coupon system. N.Y. Tax Law § 471(5)(a). Neither plaintiff in this case elected to participate in the coupon system by the August 15, 2010 deadline set forth in the tax law amendments. Accordingly, it is the prior approval system that will presumably govern if the amendments are permitted to take effect.[5]

Under the prior approval system, DTF calculates a tax-free quota of cigarettes for each Indian nation based upon the same probable demand formula noted above. N.Y. Tax Law § 471(5)(b). Before selling any portion of the tax-exempt quota of cigarettes to an Indian nation, a state-licensed stamping agent must receive "prior approval" from DTF. *See id.* TSB-M-10(6)M describes the prior approval system as follows:

---

[5] That the deadline for participation on the coupon system has passed does not foreclose either plaintiff from participating in the coupon system. The State indicated during oral argument that it would be willing to extend that deadline if a Nation was interested in participating in the coupon system.

At the beginning of each quarter, the system will display the available quantities of tax-exempt cigarettes related to Indian nations and tribes that have not elected to participate in the Indian tax exemption coupon system. As with the coupon system, the initial quantities displayed will be the quarterly amounts based on the probable demand of that Indian nation or tribe . . .

Upon receipt of a purchase request from an Indian nation or tribe or reservation cigarette seller, a wholesale dealer must sign in and check the system to determine the available cartons of stamped tax-exempt packs of cigarettes that may be sold in relation to that Indian nation or tribe. If there is an adequate quantity available, the dealer should enter the number of cartons of cigarettes to be sold to the Indian nation or tribe or reservation cigarette seller. Upon submitting the request, the remaining quantity available will be reduced by the amount requested and an authorization number for the sale will be generated.

Once an agent or dealer receives prior approval, it must resell those tax-exempt cigarettes to a reservation cigarette seller within 48 hours and provide evidence of such a sale to DTF. The agent or dealer may then request a refund from DTF for taxes prepaid on stamped cigarettes sold as tax exempt to reservation cigarette sellers. If the agent or dealer fails to resell that quantity of tax-exempt cigarettes within 48 hours of the prior approval, "the balance of the quantity not reported as sold will be added back to the quantity available for Indian tax-exempt sales." There exists no provision in the prior approval system to provide tax-exempt cigarettes to the nation and to reservation cigarette sellers if the quota is exhausted. However, the regulations do provide the Indian tribe with a mechanism for challenging the probable demand quota if the tribe feels that quota is somehow inadequate.

Both Nations seek to enjoin implementation of the amendments asserting that they impose an undue burden on the right of tribal sovereignty and, if permitted to take effect, the amendments will cause irreparable injury to their members.

## DISCUSSION

### I. Preliminary Injunction Standard

As this Court has recently held in *Red Earth, LLC v. United States*, ___ F. Supp.2d

___, 2010 WL 3061103 (W.D.N.Y. July 30, 2010),[6] injunctive relief is an extraordinary

remedy and should not be granted unless the movant has made a clear showing that he

is entitled to that relief.   To obtain a preliminary injunction, the moving party must

establish:  (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or

(b) sufficiently serious questions going to the merits of its claims to make them fair

ground for litigation, plus a balance of the hardships tipping decidedly in favor of the

moving party.  *Id.* at *3 (citing *Monserrate v. New York State Senate,* 599 F.3d 148, 154

(2d Cir. 2010)). However, where, as here, the moving party is seeking to enjoin

application of a governmental statute or regulation, the movant must demonstrate a

"likelihood of success on the merits" to obtain injunctive relief.  *Monserrate*, 599 F.3d at

154; *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007);

*Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006).

Injunctive relief enjoining a governmental regulation cannot be obtained by meeting the

lesser "sufficiently serious questions" and "balance of the hardships" standard.  *Id.*

Additionally, the movant must show that granting a preliminary injunction is in the public

---

[6] This decision is currently on appeal to the United States Court of Appeals for the Second Circuit and oral argument is anticipated to be heard the week of 11/1/2010.

interest.  *Winter v. Natural Res. Defense Council, Inc.*, ___ U.S.___, 129 S.Ct. 365 (2008).

**II.    Likelihood of Success on the Merits**

To obtain the relief they seek, the Nations must demonstrate a likelihood of success on the merits of their claims.  Although the Nations have asserted a number of claims in their respective complaints, for the purposes of injunctive relief, they are relying only upon their claim that the tax amendments impose an impermissible burden on their right of tribal sovereignty and will deny individual Nation members their right to obtain tax-free cigarettes.

**A.    Right of Tribal Self-Government**

The right of tribal self-government is firmly established.  The Supreme Court has long recognized that Indian tribes are unique aggregations possessing "attributes of sovereignty over both their members and their territory,"  *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)), and included in that sovereignty is  "the power [to regulate] their internal and social relations."  *United States v. Kagama*, 118 U.S. 375, 381-382 (1886).  Tribes posses sovereign power to "prescribe conduct of tribal members," to "exclude nonmembers entirely" from the reservation, and to "make their own laws and be ruled by them."  *See New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983) (internal

quotations omitted). Included among those sovereign rights is the right to create economic policies and to tax economic activities within its territory. *See, e.g., Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146 (1982) (upholding authority of tribe to impose severance tax on oil and gas production on reservation land); *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002)(recognizing the "strong interest" of the Pueblo tribe, as a sovereign, "in regulating economic activity involving its own members within its own territory " and in enacting laws governing such economic activity).

The Supreme Court also has recognized that individual members possess a corresponding right to engage in tax-free commerce with one another. "Indian tribes and individuals generally are exempt from state taxation within their own territory." *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 455 (1995)(quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 764 (1985)). "For this reason, a state cannot tax products such as cigarettes that are sold on an Indian reservation to non-tribal members for their own use unless authorized to do so by Congress, but can tax sales made by a tribe to individuals who are not tribal members." *Keweenaw Bay Indian Community v. Rising*, 477 F.3d 881, 887 (6th Cir. 2006); *see also McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164 (1973) (State of Arizona income tax was unlawful as applied to reservation Indians with income derived wholly from reservation sources). "States are categorically barred from placing the legal incidence of an excise tax 'on *a tribe or on tribal members* for sales made *inside Indian country*' without congressional authorization*." Wagnon v. Prairie Band Potawatomi Nation,* 546 U.S. 95, 101-02 (2005) (emphasis in original, internal citation omitted).

**B.    Authority of New York State to Tax Non-Indian Sales**

Although the right of tribal sovereignty provides Indian nations with the right to regulate their own internal and social relations and prohibits state taxation of tribal members for activity occurring solely on reservation territory, it is also equally clear that a Nation's right to tribal self-government does not oust a State of its authority to impose excise taxes for sales to nonmembers. This point was made clear by the Supreme Court in *Moe v. Consolidated Salish & Kootenai Tribes*, 425 U.S. 463 (1976), wherein the Supreme Court held that the right to tribal self-government is not violated when the State imposes a law requiring Indian retailers to collect excise taxes on non-Indian purchases occurring on reservation territory. The Supreme Court explained that the state could impose the "minimal burden" of requiring the tribal seller to collect the tax from the non-Indian at the point of sale. *Id.* at 483-84. The Court also made clear that it saw "nothing in [that] burden which frustrates tribal self-government or runs afoul of any congressional enactment dealing with the affairs of reservation Indians." *Id.* (internal citations omitted).

The Supreme Court reiterated this point several years later in *Washington v. Confederated Tribes of Colville,* 447 U.S. U.S. 134 (1980), holding that a State may require Indian cigarette retailers to collect an excise tax for on-reservation sales to non-Indians "even if [doing so] seriously disadvantages or eliminates the Indian retailer's business with non-Indians." *Colville*, 447 U.S. at 151. Importantly, *Colville* also approved of the State of Washington's authority to require the Indian retailers to collect taxes on non-Indian purchases *even where the Tribes imposed their own tribal tax on such*

15

*purchases and doing so would place the Indian retailers at a competitive disadvantage to*
*that of non-Indian retailers*.  *Id.* at 157-58.  Nor was the Court persuaded by the Tribes'
argument that, as a result of the tax-collection requirement, they were likely to lose
substantial revenue due to a reduction of cigarette sales and a corresponding loss of tax
revenue on those sales.  The Court recognized that a large majority of Tribes' sales of
cigarettes were made to "non-Indians--residents of nearby communities who journey to
the reservation especially to take advantage of the claimed tribal exemption from the
State cigarette and sales taxes" and that "if the State were able to tax sales by Indian
smokeshops and eliminate that [tax] saving[s], the stream of non-Indian bargain hunters
would dry up."  *Id.* at 145.  Tribes would inevitably lose tax revenue as a consequence of
those lost sales.  Nevertheless, the Court found that this inevitable consequence "did not
contravene the principle of tribal self-government" because "each government [i.e. the
State and the Tribe] is free to impose its own taxes without ousting the other."  *Id.* at 158.
"[T]he State does not interfere with the Tribes' power to regulate tribal enterprises when it
simply imposes its tax on sales to nonmembers."  *Id.*  at 159.  The Court determined that
"principles of federal Indian law, whether stated in terms of preemption, tribal self-
government or otherwise, [do not] authorize Indian tribes to market an exemption from
state taxation to persons who would normally do their business elsewhere."  *Id.* at 155.

Thus, as a general matter, *Moe* and *Colville* make clear that the Nations' right to
tribal self-government is not impeded by New York's decision to impose a tax-collection
duty on sales by Indian retailers to nonmembers, even if that decision carries with it the
inevitable consequence that the Nations' coffers will suffer as a result of lost cigarette

sales.  New York State can require reservation cigarette sellers to collect excise taxes on

behalf of the State for sales made to nonmembers.  *See also Oklahoma Tax Comm'n v.*

*Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 513 (1991) ("[T]he

doctrine of tribal sovereign immunity does not prevent a State from requiring Indian

retailers doing business on tribal reservations to collect a state-imposed cigarette tax on

their sales to nonmembers of the Tribe."); *California State Bd. of Equalization v.*

*Chemehuevi Indian Tribe*, 474 U.S. 9, 12 (1985) (holding that where "the legal incidence

of California's cigarette tax falls on the non-Indian consumers of cigarettes purchased

from respondent's smoke shop, [the State has the right to] require [the smokeshop] to

collect the tax on [the State's] behalf.").

Plaintiffs appears to concede this point.  The Seneca Nation expressly

acknowledges that, as a general principle, New York State has the authority to require the

reservation retailers to collect excise taxes on sales to non-Indians.  (*See* SNI Suppl.

Memo., Dkt. 65, at 5).  Further, even though the Seneca Nation asserts in its complaint

that it is  immune from New York State taxes based upon certain treaty provisions, it is not

advancing that argument in this motion.  This point is significant.  New York estimates that

of the 10 million cartons sold last year by SNI retailers, less than 70,000 were purchased

by Seneca Nation members for their own personal consumption.  Under *Moe* and *Colville*,

the vast majority of sales made by reservation retailers are taxable.

In other words, the Nations are not challenging the *authority* of New York require

them to collect cigarette taxes on sales to nonmembers.  What they challenge, rather, is

the *manner* in which those taxes are to be collected.  The Nations contend that the tax

collection system created under the amendments imposes an impermissible burden on

their right of tribal sovereignty.  They argue that:  (1) the amendments are facially invalid;

(2) the prepayment obligations impose undue burdens upon Nation cigarette retailers; (3)

the amendments fail to account for sales to out-of-state buyers who are not subject to

New York's excise tax; and (4) problems in allocation under both the coupon and prior

approval systems will deny individual members their right to purchase tax-exempt

cigarettes.


### 1.    Facial Invalidity of the Tax Law Amendments

To the extent that the Nations are challenging the tax amendments as "facially

invalid," that argument is foreclosed by the Supreme Court's decision in *Dep't of Taxation

and Finance of New York v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61 (1994).  In *Milhelm

Attea*, the Supreme Court assessed the constitutionality of an earlier version of New

York's cigarette taxing scheme.  As under the existing scheme, the law required that the

State would precollect its cigarette tax through state-licensed wholesalers who purchased

tax stamps and affixed them to cigarette packs in advance of sale within the State.  *Id.* at

64.  As under the current tax law amendments, "[t]he full amount of the tax [was] part of

the price of stamped cigarettes at all subsequent steps in the distribution scheme," with

the "ultimate incidence of the liability" falling upon the consumer.  *Id.*  Also, as under the

current amendments, the regulations at issue "limit[ed] the quantity of untaxed cigarettes

that wholesalers [could] sell to tribes and tribal retailers."  *Id.*  The quantity of untaxed

cigarettes was determined based upon a "probable demand" quota, which (as under the

new tax amendments) was determined "by multiplying the New York average cigarette consumption per capita by the number of enrolled members of the affected tribe." *Id.* (quotations omitted). The "probable demand" quota was to be enforced based upon "tax exemption coupons" that were sent by the State to various cigarette retailers entitling them to a "monthly allotment of tax-exempt cigarettes." *Id.* at 66. Under that scheme, the retailer was to "give copies of its coupons to the wholesaler upon delivery, and the wholesaler forwards one to the Department [of Taxation and Finance]." *Id.*

The tax exempt coupon scheme at issue in *Milhelm Attea* was in all material respects substantially similar to the coupon scheme set forth under the new amendments. The key distinction between the prior scheme upheld in *Milhelm Attea* and the new tax law amendments at issue here is that, under the prior regulations, it was the *State* that decided how the coupons were to be distributed, whereas under the new scheme, it is the *Nation* that receives all of the coupons and bears the burden of determining how they should be distributed. However, for the purposes of a facial challenge where the Court is being asked to assess whether "'the law is unconstitutional in all of its applications,'" *see Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)), this distinction is inconsequential. Where, as here, the statute at issue "has a plainly legitimate sweep," a facial challenge must fail. *Id.* (quotation omitted). In other words, in this facial challenge, the Nations must demonstrate "not the [unconstitutionality] of the statute as applied to a particular set of plaintiffs before it," *see Washington v. Gluksberg*, 521 U.S. 702, 740 (1997) (Stevens, J., concurring), but the unconstitutionality

of the statute's general imposition of a limit on the amount of tax- free cigarettes to be sold by Indian retailers.  On that issue, the Supreme Court has already spoken.  In *Milhelm Attea*, the Court rejected a facial challenge to the validity of  "the Department's authority to impose such limits [on the number of tax-free cigarettes being sold by cigarette retailers] at all."  *See Milhelm Attea*, 512 U.S. at 69.  The Court expressly held that neither the coupon system nor the requirement that the State "preapprove" deliveries of tax-exempt cigarettes in order to ensure compliance with the quotas rendered the regulations facially invalid because the procedure was not unduly burdensome absent some wrongful withholding or delay of approval.  *Id.*  at 75-76.

Plaintiffs correctly note that the Supreme Court expressly limited its *Milhelm Attea* holding to "the narrow[] question of whether the New York scheme is inconsistent with the Indian Trader Statutes" and was not being called upon to address "for all purposes each feature of New York's tax enforcement scheme that might affect tribal self-government or federal authority over Indian affairs."  *Id.* at 69-70.  Nevertheless, the Court also made clear that its holding rested on the principles of tribal sovereignty that it had earlier established in *Moe* and *Colville*.  *See Milhelm Attea*, 512 U.S. at 74.  Thus, at least for the purposes of assessing the facial validity of the New York cigarette tax scheme, the Court found that the principles of tribal sovereignty outlined in *Moe* and *Colville*, and reiterated again in *Milhelm Attea*, were not offended by the tax scheme.   Accordingly, the Court rejects plaintiffs' facial challenge to the tax law amendments.

**2.      Burden of Prepayment of Taxes for Sales to Non-Indians**

The Cayuga Nation challenges the prepayment requirement of the tax law

amendments.  Under the new scheme, reservation retailers are required to prepay state

excise taxes on the *taxable cigarettes* that later will be resold to non-Indian purchasers.

The Cayuga Nation argues that:

> when a tribe purchases cigarettes from a wholesaler for sale to non-
> members, (1) it pays the wholesale price for the cigarettes, and (2) it also
> prepays an amount, which constitutes prepayment of the state excise taxes
> on the cigarettes in question.  The amount of the excise tax is significant -
> $4.35 per pack, or $43.50 for each carton purchased by the tribe.  For the
> entire time that the carton is held in inventory before it is sold, those funds
> have essentially been loaned by the tribe to the State, without interest.  Only
> when the cigarettes are sold to a non-Indian consumer does the tribe collect
> the state taxes, thus recouping the amount that it advanced to the State by
> prepaying the tax.

*(See* CIN Supp. Memo., Dkt. 40, at 4).  Thus, *as to cigarettes intended to be purchased by*

*non-Indians*,[7]  the Cayuga Nation argues that it is unduly burdensome to require it to

prepay excise taxes that will not be recouped until the cigarettes are purchased by non-

Indian buyers.

The Supreme Court has repeatedly upheld state taxing schemes that impose

prepayment obligations like the one at issue in this case.  The taxing schemes approved

of in *Moe* and *Colville* both required reservation retailers to prepay taxes for taxable

cigarettes upon purchase of those cigarettes from the wholesaler, and then recoup those

---

[7]  It should be noted that this argument relates only to the taxable cigarettes - i.e. those
cigarettes that are not part of the "quota" of tax-exempt cigarettes.  Under the tax law
amendments, Indian retailers do not bear the burden of prepaying taxes on the tax-exempt
quota of cigarettes.  That burden is borne solely by the state-licensed wholesalers who must
prepay the taxes on tax-exempt cigarettes and then apply for a refund once those cigarettes
are sold to reservation retailers.

taxes at some later point when a non-Indian purchaser buys them. *Moe* approved of a

Montana tax scheme under which the seller prepaid the tax to the wholesaler and added it

to the purchase price of the cigarettes. *See e.g. Moe v. Confederated Salish and*

*Kootenai Tribes,* 392 F.Supp. 1297, 1308 (D. Mont. 1975) (describing prepayment under

Montana scheme). Likewise, in *Colville*, the Supreme Court approved of a Washington

tax scheme that (like New York) required prepaid tax stamps to be affixed to all cigarettes

that were later sold to non-Indians.[8] *See Colville*, 447 U.S. at 141-42.

Prepayment schemes even more burdensome than New York's have also been

upheld. For example, in *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881 (6th Cir.

2006), the Sixth Circuit upheld that a Michigan cigarette tax scheme requiring tribal

retailers to prepay taxes on all cigarettes, including tax-exempt ones sold to tribal

members. Under that scheme, reservation retailers were required to request a refund of

taxes that were prepaid on tax-exempt cigarettes. The Circuit held that "Michigan's

prophylactic refund system is 'reasonably tailored to the collection of valid taxes from non-

Indians'" and rejected arguments (like the one being made in this case) that the

prepayment obligation was tantamount to a "temporary tax" or "interest free loan" to

Michigan. *Id.* at 892.

It is clear that New York's tax scheme–requiring prepayment of taxes on all

cigarettes intended to be sold to nonmembers–imposes a permissible burden on the

Nation and Nation retailers. In an effort to distinguish this case from that clear Supreme

Court precedent, the Cayuga Nation asserts that the prepayment obligations here are far

---

[8] Unlike New York's scheme, however, Indian tribes were entitled to possess a quantity of *unstamped* cigarettes to be sold to members of the tribe. *Colville*, 447 U.S. at 141.

22

more burdensome given the *amount* of the tax. For example, the tax upheld in Colville was only $1.60 per carton, whereas the State is now seeking to collect prepaid taxes in the amount of $43.50 per carton. While it is true that the tax imposed by New York is significantly higher than the amounts previously authorized by the Supreme Court, that fact alone is insufficient to escape the precedential holdings of those cases. The Supreme Court's holdings were not grounded in the *amount* of the taxes that were required to be prepaid, but rather that fact that a prepayment scheme was permissible in the first place. As to sales of cigarettes that ultimately would be resold to non-Indians, the Court found that prepayment imposed only a "minimal burden" on tribes and was "designed to avoid the likelihood that in the absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax." *Moe*, 425 U.S. at 483. Because there is no additional administrative burden placed upon the tribes simply because the amount of the tax is higher, the Cayuga Nation's challenge to the prepayment scheme is rejected.

### 3.      Impermissible Taxation of Out-of-State Sales

Plaintiffs argue that the amendments are invalid because they impermissibly tax sales to non-Indians located outside New York State. As the State concedes, New York's jurisdiction to tax extends only to non-Indian sales occurring in New York. New York lacks authority to collect excise taxes for out-of-state sales. Yet, by requiring prepaid tax stamps to be affixed on *all cigarettes* purchased by reservation retailers, the Nations argue that New York is effectively taxing cigarettes on sales over which it has no

23

jurisdiction to tax.  Evidence presented at the hearing suggested that as many as half of

the 10 million cartons of cigarettes purchased from Seneca Nation retailers last year were

purchased by non-Indians located outside of New York State.  The Nations argue that,

under the amendments, New York is impermissibly collecting taxes on 5 million cartons

that it legally has no authority to tax.

In response, the State points out that an entirely separate provision of the New

York Tax Law provides a mechanism for cigarette retailers to obtain a refund for cigarette

sales made to out-of-state purchasers.  Section 476 of the New York Tax Law provides:

> Whenever any cigarettes upon which stamps have been placed or tobacco
> products upon which the tax has been paid have been sold and shipped into
> another state for sale or use there or have become unfit for use and
> consumption or unsalable, or have been destroyed, or whenever the
> commissioner of taxation and finance shall have determined that any tax
> imposed by this article shall have been paid in error, the agent, dealer or
> tobacco products distributor, as the case may be, shall be entitled to a
> refund of the actual amount of tax so paid . . .

N.Y. Tax Law § 476.  Under this refund provision, the Nations' retailers will be treated the

same as all other cigarette retailers who ship cigarettes out of state.  This refund provision

represents a legitimate, nondiscriminatory state law that applies equally to reservation and

non-reservation cigarette sellers operating in New York.  In *Mescalero Apache Tribe v.*

*Jones*, 411 U.S.145 (1973), the Supreme Court held that "[a]bsent express federal law to

the contrary, Indians going beyond reservation boundaries have generally been held

subject to non-discriminatory state law otherwise applicable to citizens of the State.  That

principle is as relevant to a State's tax laws as it is to state criminal laws.. . ."  *Id.* at 148-49

(internal citations omitted).

To the extent that some of the New York State tax-stamped cigarettes purchased by plaintiffs are later shipped out of state, reservation retailers, like all other cigarette sellers in New York, can apply for a refund of the prepaid New York cigarette tax.[9] Therefore, plaintiffs have failed to show that the tax law amendments impose an unconstitutional burden based upon the failure to account for sales to non-Indians living outside New York.

**4.    Allocation Problems Create Undue Burden**

Finally, plaintiffs argue that the problem of allocating the *tax-exempt* cigarettes among the Nations' many cigarette retailers will impose undue burdens upon the Nations. Regardless of whether the coupon system or the prior approval system is chosen, they argue that the issue of allocating the tax-exempt cigarettes in a manner that ensures every member will have access to tax-exempt cigarettes is unduly burdensome and interferes with tribal sovereignty.

---

[9]   Plaintiffs argue that it is unclear whether they would qualify for a refund because the tax refund provisions refer only to "dealers" as defined by N.Y. Tax Law § § 470(70-(9) and not to "reservation cigarette sellers" as defined by N.Y. Tax Law § 470(17).  Dealers are required to comply with mandatory registration and recordkeeping requirements, whereas reservation cigarette sellers are not.  However, during the hearing, John Bartlett, Director of Regulations in DTF's Taxpayer Guidance Division, testified the DTF considers every reservation cigarette seller to be a "dealer" within the meaning of § 476 and the corresponding regulations.  In light of Bartlett's testimony, plaintiffs' claim that they may not qualify as a "dealer" for the purposes of a tax refund is speculative and unripe at this juncture.  *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (internal quotation omitted). Moreover, in light of Bartlett's testimony, DTF may be judicially estopped from denying applications for refunds on the grounds that reservation cigarette sellers are not "dealers" under the regulations.

### i.    Burdens under Coupon System

As noted, under the coupon system, the State would provide each Nation with a quantity of coupons representing the amount of cigarette packs that the Nation is entitled to receive tax free under the State's "probable demand" calculation.  Those coupons can then be used by the Nation, or distributed to individual retailers, to obtain tax-free (albeit tax-stamped) cigarettes from state-licensed wholesalers.  Plaintiffs assert that the coupon scheme interferes with their right of tribal sovereignty because it requires them to create and implement a coupon-allocation scheme to distribute the coupons among the Nations' various retailers.

As to the Cayuga Nation, the Court finds that implementation of the coupon system would impose only a minimal burden.  The State has calculated the Cayuga Nation's "probable demand" to be 20,100 packs per quarter.  The Cayuga Nation has only two stores, both of which are Nation-owned.  The Nation can easily implement a system whereby it uses all the coupons to redeem whatever inventory of cigarettes it needs, leaving it to individual members to present evidence of Nation membership (perhaps via a Nation identification card) to obtain the tax-free cigarettes.  To ensure a sufficient quantity of cigarettes for each member, the Nation can set a limit on the number of packs to be purchased by an individual member per quarter.  The Cayuga Nation's as applied challenge to the coupon system is rejected.

As to the Seneca Nation, the issue is more complex as that Nation has what it characterizes as a thriving, highly competitive free market tobacco economy consisting of approximately 172 different privately-owned cigarette retailers.  The Nation argues that creating a system to distribute the coupons fairly among its numerous retailers "require the

26

Nation's government to play a far more intrusive role in the tobacco economy than it has chosen for itself [because] the [Nation] would have to allocate the State's pre-determined quota among the Nation's numerous licensed stamping agents and retailers." (*See* SNI Brief, Dkt. 4, Exh. 1, at 20). According to the Nation, doing so would subject leaders to challenges of favoritism and incompetence and "would require the radical transformation of the [Nation's] role from one of responsible regulator to that of the principal operator in a centralized command economy." (*Id.*) SNI asserts that this could lead to potentially destabilizing consequences.

The State counters that the coupon system imposes no burden at all on the right of tribal self-government because it does not require that the Nation actually distribute the coupons in the first place. The Court does not agree. In order for the coupon system to work, the Nation must distribute the coupons. If the Nation were to refuse to distribute the coupons, it would be interfering with the corresponding right of its members to purchase tax-exempt cigarettes from reservation retailers. In other words, if no coupons are distributed, then no tax-free cigarettes are available for purchase by the Nation's members. This course of action (or more properly, inaction) would ultimately deprive Nation members of their individual right to purchase untaxed cigarettes from reservation retailers. The State's position that the Nation can acquire–but not distribute–the coupons is simply untenable. If the coupon system is chosen, then the Nation *must* distribute the coupons or the Nation will be actively interfering with the right of its members to purchase untaxed cigarettes. The coupon system will only work if the coupons are distributed.

The Court must assume, then, that the coupons will be distributed and determine whether the burden of distribution imposed by the coupon system places more than a

27

minimal burden on the Seneca Nation.  Requiring the Nation to distribute the coupons may require it to become involved in matters that it claims to have consciously avoided delving into, namely, decisions concerning which of the Nation's 172 tobacco retailers should be given coupons and, if so, how many coupons to give that retailer.  The Nation claims that the coupon-allocation burden far exceeds any minimal burden previously approved of by the Supreme Court.

The task of allocating coupons among the Nation's retailers may be somewhat more onerous than the "minimal burden" approved of by the Supreme Court in *Moe, Colville* and their progeny.  Those cases simply spoke to whether individual cigarette retailers could be required to act as the State's agent for the purposes of collecting excise taxes on sales to nonmembers.  Existing Supreme Court decisions do not speak to the issue of whether compelling a tribe to make coupon-allocation decisions unconstitutionally burdens its right of tribal sovereignty.  *Milhelm Attea* does not speak to that issue because, under the version of New York's coupon system that existed at the time that case was decided, the burden of  distributing the coupons to the individual retailers was borne solely by the State, not the Nation.   Furthermore, although the Supreme Court in *Milhelm Attea* approved of a quota and coupon system in principle, the Court expressly declined to determine how that system would "affect tribal self-government" as that issue was not properly before the Court.  *See Milhelm Attea*, 512 U.S. at 69-70.

Ultimately, however, the Court need not decide whether the task of allocating coupons imposes an impermissible burden.  Even if the coupon system can be said to do so, the Nation has another option–it can decline to participate in the coupon system and

let the prior approval system govern the allocation of tax-exempt cigarettes. For the reasons that will be discussed, the prior approval system can operate without the Nation becoming involved in allocating cigarettes and imposes no more than a minimal burden on the right of tribal sovereignty.

### ii. <u>*Burdens Under Prior Approval System*</u>

To avoid the burdens purportedly imposed upon the Seneca Nation under the coupon system, the Seneca Nation can simply decline to participate in the coupon system – which it in fact has done. By failing to opt for participation in the coupon system by August 15, 2010, the alternative "prior approval" system will govern allocation of the tax-exempt cigarettes by operation of law.

To reiterate, under the prior approval system, each Nation is assigned a "quota" of tax-exempt cigarettes based upon that Nation's probable demand calculation. At the beginning of each quarter, the quota available is displayed on the DTF website. Upon receipt of a purchase request from a Nation or reservation cigarette seller, a state-licensed wholesaler must sign in and check the system to determine the available number of stamped tax-exempt cigarettes that may be sold for that Nation. If there is an adequate quantity available, the wholesaler will enter the number of cartons of cigarettes to be sold to the Indian nation or reservation retailer. Upon submitting the request, the quota will be reduced by the amount requested and an authorization number for the sale will be generated.

Once prior approval is received, the wholesaler must resell those tax-exempt cigarettes to a reservation cigarette seller within 48 hours and provide evidence of the sale

to DTF.  If the wholesaler fails to do so within 48 hours of the prior approval, "the balance of the quantity not reported as sold will be added back to the quantity available for Indian tax-exempt sales."  At that point, it can be purchased by another wholesaler.

Before addressing the impact of the prior approval system on the Seneca Nation, it should be noted that the prior approval system imposes no more than a minimal burden upon the Cayuga Nation. The Cayuga Nation has only two tobacco retail stores, both of which are operated by the Nation. At the beginning of each quarter, the Nation is entitled to acquire the entire probable demand quota (of 20,100 packs) from state wholesalers without prepayment of any state tax on that quota. Upon proof of Nation membership at one of the Nation's two stores, the Indian-purchaser would be entitled to obtain cigarettes tax free. The minimal burden imposed under the prior approval system as applied to CIN is entirely permissible.

As applied to the Seneca Nation, SNI witnesses testified during the hearing concerning numerous problems presented by the prior approval system.  Perhaps most obvious is that the system creates incentive for a single wholesaler to acquire as much of the quota as possible so that s/he can then resell the tax-exempt cigarettes to reservation retailers at a premium.  In fact, the Seneca Nation has cited to an affidavit of a state-licensed wholesaler who affirmatively states that if the prior approval system is implemented, he intends to acquire "the entire tax-exempt allocation" for the Seneca Nation and that he also intends to sell that entire quota only to his existing customers. (*See* Aff. of Peter Day dated September 21, 2010, Dkt.74, Exh. A, ¶ 35).  Day further states that "given the high demand" for tax-exempt cigarettes, "tribal members can expect to pay higher prices" for those cigarettes.  (*Id.* at ¶ 33).

The State's own witness, John Bartlett, admitted that there is nothing in the tax law amendments that would prohibit a single wholesaler from acquiring a Nation's entire probable demand quota. Nor is there anything in the regulations that would prohibit that wholesaler from selling that entire quota to only one cigarette retailer–at a premium. Thus, there is a very realistic possibility that the scenario presaged by Day will occur.

In addition to the Day affidavit, an economist who testified on behalf of the Seneca Nation, Jonathon Taylor, opined that under the prior approval system, there will be a disruption in cigarette supplies because some of the Nation's retailers will be unable to acquire *any* of the tax-exempt cigarettes, putting them at a competitive disadvantage to retailers who are fortunate enough to acquire a portion of the tax-exempt quota. Taylor testified that the prior approval system encourages a "first come, first serve, all you can eat" system of competition.

That the monopoly situation predicted by Day and Taylor may occur does not mean that the prior approval system is unconstitutional. It is important to remember that nothing about the prior approval system actually *mandates* the Nation to become involved in the allocation of the tax-exempt cigarettes. While the Nation may find it *prudent* to act under the prior approval system in order to protect the rights of its members and ensure that every member can acquire some portion of the quota, the Nation is not actually *compelled* to do so. Instead, the Nation can simply refrain from acting and let principles of the existing Seneca Nation free market economy govern the supply and distribution of the tax-free cigarettes.

The Nation argues that inaction is no option because, without governmental intervention, the right of individual members to purchase tax-free cigarettes will be unduly

31

burdened.  The Nation asserts that members will be denied their right to purchase tax-free cigarettes because: (1) if one cigarette retailer acquires the entire quantity to the exclusion of all others, members wanting to purchase tax-free cigarettes would have to seek out the cigarette retailer with the tax-exempt quantity, which may require the member to travel up to 30 miles to do so; and (2) even if the member did manage to locate tax-free cigarettes, the "premium" charged by the monopolistic wholesaler or retailer would effectively eliminate the "tax free" nature of the cigarettes.

As to the first point, the Court does not believe that the Supreme Court would find it to be an unconstitutional burden to require a member to travel on occasion for several miles to obtain tax-free cigarettes, particularly when weighed against what the Court has identified as a "valid [State] interest in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations." *Milhelm Attea*, 512 U.S. at 73.

As to the second point, there may be occasions when a "premium" charged by a monopolistic retailer eviscerates any tax savings to the individual member.  However, it would not be by virtue of conduct by the State.  Instead, it would simply be the natural consequence of putting a scarce commodity out on a highly competitive free market. Those charging the "premium" for the scarce commodity would be private individuals looking to capitalize on the scarcity – not the State itself.  The only thing the State is doing is limiting the quantity of tax-free cigarettes that are currently available for sale by reservation retailers.  It is making something that was once in abundant supply (tax-free cigarettes) a scarce commodity.  However, the State has the right to do that because, as the Seneca Nation concedes, sales to non-Indians are taxable, and Supreme Court

precedent gives New York the right to require Nation retailers to collect that tax.  It also must be remembered that if the Seneca Nation wishes to ensure that this monopoly does not occur, it has the right, but not the obligation, to act to ensure that one retailer does not acquire all of the tax-exempt cigarettes.

The Seneca Nation cites other potential behaviors as a basis for invalidating the prior approval system. For example, the Nation asserts that individuals who acquire the tax-exempt cigarettes may engage in "hoarding" by holding onto the cigarettes and refusing to sell them to Nation retailers.  Alternatively, the Nation asserts that the amendments create an environment that encourages cigarette trafficking and undermines the purposes of its own IEL.

As to the hoarding issue, the regulations appear to safeguard against that behavior by requiring state wholesalers to provide evidence of a sale within 48 hours of acquiring the quota.  If the state wholesaler fails to resell the tax-exempt cigarettes to reservation retailers–and provide evidence of that sale to DTF within 48 hours of acquiring the quota–that portion of the quota automatically becomes available for purchase by another wholesaler.  In light of that requirement, predictions of hoarding are speculative.

As to the second point, it is unknown whether incidents of cigarette trafficking will increase following implementation of the amendments.  It is possible that cigarette trafficking will increase statewide (both on reservation and off-reservation) as the taxes to be evaded ($43.50 per carton) are substantial.  However, the fact that some individuals may choose to thwart the law and act illegally cannot be a basis for invalidating an otherwise lawful statute.  Furthermore, nothing about the new tax law prohibits the Seneca Nation from continuing to enforce its own IEL.  Where, as here, there is "no direct conflict

between the state and tribal schemes, . . . each government is free to impose taxes [and regulate the sale of cigarettes] without ousting the other." *Colville*, 447 U.S. at 159. The Court sees no direct conflict between the State and Nation laws that would warrant invalidation of the tax law amendments.[10]

Because the prior approval system does not compel a tribe or nation to become actively involved in regulating the distribution of tax-exempt cigarettes and instead leaves allocation of tax-exempt cigarettes entirely to free market forces, the Court does not believe that it imposes an unconstitutional burden. As such, the Nations have failed to establish a likelihood of success on the merits of their claim that the tax law amendments unconstitutionally burden the right of tribal sovereignty.

## CONCLUSION

For the reasons stated, the Court finds that the Nations' right of tribal sovereignty is not unconstitutionally burdened by implementation of the tax law amendments. Having failed to demonstrate a likelihood of success on the merits of their claims, the motion for a preliminary injunction is **denied.** A showing of likelihood of success essential to the relief

---

[10] On this point, the Court specifically rejects testimony suggesting that it would be impossible for the Nation's tax stamp and the State's tax stamp both to fit on the bottom of a package of cigarettes. Both stamps are quite small and there appears to be ample room on the bottom of a package of cigarettes for both stamps to fit.
　　Nation witness also expressed concern that they would be unable to distinguish a retailer's tax-exempt inventory from its taxable inventory. This is because all of the cigarettes must carry a New York State tax stamp, even if they were acquired as part of the tax-exempt quota. If the Nation deems it important to be able to distinguish tax-exempt inventory from taxable inventory, that concern can be remedied by requiring Nation retailers to keep detailed records of any tax-exempt cigarettes acquired. *See Milhelm Attea*, 512 U.S. at 76 (stating that it is not unduly burdensome to require detailed records to be kept on tax-exempt transactions).

sought and without it, a preliminary injunction cannot issue.  The absence of that essential element also renders analysis of irreparable injury and the public interest moot.  *See Monserrate v. New York State Senate*, 599 F.3d 148, 154 and n. 3 (2d Cir. 2010) (finding that the plaintiff's failure to establish a likelihood of success on the merits mooted other concerns such as whether irreparable injury had been established and whether an injunction was in the public interest).[11]


     SO ORDERED.


                  s/ *Richard J. Arcara*
                  HONORABLE RICHARD J. ARCARA
                  UNITED STATES DISTRICT JUDGE

DATED: October 14, 2010

---

[11] Although considerations of irreparable injury and the public interest are moot for the purposes of determining whether a preliminary injunction issue, those factors must be weighed in considering whether to grant a stay pending appeal.  The Court will issue a separate ruling addressing the issue of a stay pending appeal.